**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

OSEI A. HARPER,
613 E. 9th Avenue
Havana, Florida 32333,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE NAVY;
HUNG CAO, in his official capacity as Acting Secretary of the Navy,

Defendants.

Civil Action No. 4:26-cv-00395-AW-MAF

(Administrative Procedure Act Review)

No Jury Demand — Review on the Administrative Record

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701–706

## INTRODUCTION

1. This is a narrow action for judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, of a single final agency action: the decision of the Board for Correction of Naval Records ("BCNR" or "Board"), Docket No. 8252-25 (NR20250008252), signed February 26, 2026, denying Plaintiff's application under 10 U.S.C. § 1552 for correction of his naval record ("the Decision"; a copy is attached as Exhibit 1).

2. This action does not ask the Court to reweigh Plaintiff's military record, reconsider the seriousness of particular misconduct, or substitute judicial judgment for military discretion. The challenged defect precedes those questions. Plaintiff presented BCNR with specific contradictions,



FILED USDC FLND TL
AUG 20 '26 PM4:18 BF

omissions, and discontinuities appearing within the government's own contemporaneous records — substantial documentary evidence contrary to the regularity BCNR presumed. The Board did not reconcile those defects before relying upon the resulting record to sustain its dispositive premises. The question presented is therefore not whether BCNR reached the preferable outcome on a disputed set of facts, but whether it could lawfully exercise discretion on predicates its own record left materially unresolved.

3. The facts challenged here are not Plaintiff's reconstruction of the record. They are the observable incongruities, inconsistencies, and omissions within the record itself that BCNR did not adjudicate, explain, or resolve.

4. The application before the Board was, at its core, a challenge to the integrity and completeness of the official record itself. Plaintiff contended that the record on which his 1992 other-than-honorable ("OTH") discharge rests is materially incomplete, internally contradictory, and in specific, identified respects irreconcilable with the copies of the same record produced by the government's own custodians. That concern did not originate in this litigation: Plaintiff recorded the routine loss of paperwork contemporaneously in 1992, during separation processing. In one respect central to this complaint, the contradiction is internal: the government's own contemporaneous record contains the evidence that materially undermines the offense on which the government later relied. The question this action presents is correspondingly narrow: not whether the 1992 discharge should be retried in district court, but whether the Decision provides a reasoned answer to the material, nonfrivolous, record-based arguments that were actually before the Board and were capable of affecting its disposition.

5. The Board resolved the record-integrity challenge by presuming the answer to it. The Decision states that "the Board determined the presumption of regularity applies to the finding that you committed the misconduct that formed the basis of your administrative separation," and it closes by instructing Plaintiff that "a presumption of regularity attaches to all official records." But the Board's own regulation makes that presumption expressly conditional: it operates only "in the absence of substantial evidence to the contrary." 32 C.F.R. § 723.3(e)(2). Plaintiff does not contend that a correction board may never rely on the presumption of regularity. He contends that the Board could not rely on it here without first resolving the specific documentary evidence of irregularity placed before it — and the Decision resolves none of that evidence. That failure is especially consequential because Congress assigned the correction board an affirmative corrective function: to determine whether a naval record should be corrected to remedy error or injustice. 10 U.S.C. § 1552. A presumption that merely reproduces the challenged historical conclusion cannot substitute for the exercise of that corrective judgment when substantial contrary evidence is before the Board.

6. The Decision also states that, as to Plaintiff's contentions of mistreatment, discrimination, medical neglect, and denial of due process, Plaintiff "provided no evidence, other than your statement, to substantiate your contentions" — while the first page of the same Decision recites that the Board considered Plaintiff's "application together with all material submitted in support thereof." Plaintiff's documented submissions — several bearing delivery and read confirmations from the Board's own mailbox — included documentary evidence directed to precisely those contentions. The transmittal records identify the attachments, confirm relay to the Board's designated mailbox, and, for multiple material submissions, include read confirmations

generated by that mailbox. The Decision neither acknowledges that documentary evidence nor explains why it did not substantiate the contentions to which it was expressly directed. Its two descriptions of the evidentiary record therefore cannot be reconciled on the face of the Decision and the documented submission record.

7. Plaintiff also expressly presented equity, injustice, and clemency as an independent ground for relief. Although the Decision recites the governing clemency guidance and lists factors it states the Board considered — including “your rehabilitation efforts” and “the passage of time since your discharge” — it does not decide that ground through analysis of the evidence submitted for it. In the nearly thirty-four years since his discharge, Plaintiff has never been arrested for, charged with, or convicted of any offense, and has built a documented record of education, professional credentials, and published work, all expressly transmitted for equitable consideration. The Decision mentions none of that evidence and instead disposes of every listed factor collectively through the same unexplained severity conclusion.

8. Plaintiff seeks vacatur of the Decision and remand for reconsideration under the correct decisional framework. He seeks no money damages in this action. None of the complaint’s grounds depends on crediting Plaintiff’s recollection: the documents identify the arguments; the government’s own systems establish their transmission; and the Decision supplies the agency’s reasoning. Where a document survives only in Plaintiff’s personal copy, it is offered — together with its documented absence from the government’s productions — to describe the subsequent fragmentation of the government’s record, not to enlarge the record that was before the Board; the APA merits rest on the materials actually before the Board, and they do not rest on memory. The

Court is asked only to determine whether the latter rationally answers the former. The complaint does not depend upon reconstruction of every event of 1992; it depends upon the materials actually before the Board when it issued the 2026 Decision, and the relevant contradictions are already present within the decisional record the Board cited and presumed regular. The recurring defect is one of amplification: unresolved defects in the historical record were not merely carried forward; the Decision converted them into a larger specification count, a broader characterization of "complete disregard," a finding of voluntary choice, a categorical severity premise, and a basis for declaring otherwise material mitigation and clemency evidence incapable of changing the result — each step adverse to Plaintiff and none explained by a corresponding resolution of the underlying record conflict.

**JURISDICTION, VENUE, AND TIMELINESS**

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331. The APA waives sovereign immunity for actions seeking relief other than money damages, 5 U.S.C. § 702, and provides for judicial review of final agency action for which there is no other adequate remedy in a court, 5 U.S.C. § 704.

10. The Decision is final agency action. It denied Plaintiff's application on the merits, marked the consummation of the Board's decisionmaking process, and determined Plaintiff's rights with legal consequences.

11. This action seeks only declaratory and injunctive relief — vacatur and remand. It asserts no claim for money damages and disclaims back pay and monetary relief of every kind.

The exclusive jurisdiction of the Court of Federal Claims under the Tucker Act is accordingly not implicated.

12. This action is timely. The Decision issued on February 26, 2026. This action is filed well within the six-year period of 28 U.S.C. § 2401(a).

13. Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C). This is an action against agencies of the United States and an officer of the United States sued in his official capacity; no real property is involved in the action; and Plaintiff resides in this district, in Gadsden County, Florida, within the Tallahassee Division.

## PARTIES

14. Plaintiff Osei A. Harper is a veteran of the United States Navy. He entered active duty on December 11, 1990, served until September 21, 1992, and was separated with an other-than-honorable characterization of service. He resides in Havana, Florida, and proceeds pro se. His service records, including his DD Form 214 (a redacted copy of which is attached as Exhibit 2), reflect the name under which he then served; references in the record to that name are references to Plaintiff. He continues to bear concrete, ongoing consequences of the characterization under review, including an RE-4 reenlistment bar and preclusion from benefits and programs conditioned upon characterization of service.

15. Defendant United States Department of the Navy is a military department of the United States within the Department of Defense and an "agency" within the meaning of 5 U.S.C. §§ 551(1) and 701(b)(1).

16. Defendant Hung Cao is the Acting Secretary of the Navy and is sued in his official capacity only. The authority to correct naval records under 10 U.S.C. § 1552 runs to the Secretary, acting through boards of civilians. Pursuant to Federal Rule of Civil Procedure 25(d), any successor is automatically substituted.

17. The Board for Correction of Naval Records is the civilian board through which the Secretary exercises the correction authority conferred by 10 U.S.C. § 1552, see 32 C.F.R. § 723.2. The BCNR issued the February 26, 2026 Decision constituting the final agency action challenged in this case.

## STANDARD OF REVIEW

18. Under 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency acts arbitrarily when it "entirely fail[s] to consider an important aspect of the problem," offers an explanation that runs counter to the evidence, or fails to articulate a rational connection between the facts found and the choice made. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971).

19. These principles apply with full force to military records-correction boards. Although review of such boards is deferential, a correction board must respond to those arguments of an applicant that are not frivolous on their face and could affect the Board's ultimate disposition. Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997) (reversing precisely because the board failed to answer two such arguments). The board must give a reasoned explanation rather than conclusory

boilerplate, Dickson v. Sec'y of Defense, 68 F.3d 1396, 1404–05 (D.C. Cir. 1995), must provide an explanation adequate to permit judicial review, Kreis v. Sec'y of the Air Force, 866 F.2d 1508, 1514–15 (D.C. Cir. 1989), and may not simply ignore evidence contrary to its conclusion, Butte County v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010); see also Haselwander v. McHugh, 774 F.3d 990, 996–99 (D.C. Cir. 2014). These decisions arise principally in the D.C. Circuit, which reviews the largest share of correction-board litigation; they articulate the consensus application of State Farm to boards operating under 10 U.S.C. § 1552, and are persuasive authority in this district. The Eleventh Circuit engages the same corrective architecture: it recognizes the BCNR process and has stated that the Secretary cannot act arbitrarily with respect to the Board's corrective function. See Winck v. England, 344 F.3d 1233 (11th Cir. 2003). Review under these standards examines the adequacy of the Board's decisionmaking process, not the substantive correctness of its ultimate conclusion: a court may order remand for the failure to address core nonfrivolous arguments without questioning the propriety of the outcome the board reached. See Rutledge v. Del Toro, No. 23-cv-1583, slip op. (D.D.C. June 28, 2024) (Cooper, J.) (the court must "limit [its] inquiry to whether the [Board]'s decision making process was deficient, not whether [its] decision was correct"; remanding for a more complete explanation where the Board failed to respond to nonfrivolous arguments). A correction board likewise acts arbitrarily when it fails to engage meaningfully with a central question necessary to adjudicate the claim before it. See Baxley v. Driscoll, No. 24-5104, slip op. at 11 (D.C. Cir. June 26, 2026) (board's decision arbitrary and capricious where the board "did not ask, let alone answer," the central question on which the claim depended).

20. The presumption of regularity on which the Decision rests is, by the Board's own regulation, conditional: the Board relies on it "in the absence of substantial evidence to the contrary." 32 C.F.R. § 723.3(e)(2); accord United States v. Chemical Foundation, Inc., 272 U.S. 1, 14–15 (1926) (presumption operates "in the absence of clear evidence to the contrary"). Frizelle itself recognizes both halves of the rule: an administrative record may ordinarily be presumed regular, yet apparent deviations from required procedure and specific contrary evidence cannot simply be ignored. 111 F.3d at 177–78. The presumption is a rule for the absence of evidence; it is not a device for declining to resolve the evidence that is present. And the Board's own regulations independently require it to review the pertinent evidence of record, 32 C.F.R. § 723.3(e)(1), and, when it denies relief, to state the grounds and the essential facts upon which the denial is based, 32 C.F.R. § 723.3(e)(3)–(4). The duty to answer is therefore not only settled case-law doctrine; it is the agency's own rule.

## FACTUAL ALLEGATIONS

### A. The Record Before BCNR Contained Multiple Material Irregularities

21. Plaintiff entered active duty in the United States Navy on December 11, 1990, at age eighteen, from New Haven, Connecticut. He finished at the top of his class in technical training, earned a Letter of Appreciation, and received above-average early evaluations; his performance evaluation of January 31, 1992 assigned an overall mark of 3.6, recorded that he had "unlimited potential to succeed," and recommended him for retention. Between November 1991 and May 1992 he received a series of adverse administrative and disciplinary actions recited at pages one through three of the Decision — a counseling warning, three non-judicial punishments ("NJPs")

(January 8, May 4, and May 20, 1992), and further counseling — with the absence specifications among them described in the Decision's own recitals as failures "to go to your appointed place of duty." An administrative discharge board ("ADB") convened on July 25, 1992 and recommended separation with an OTH characterization. Plaintiff, nineteen years old through the January-to-early-May events and newly twenty thereafter, was discharged on September 21, 1992.

22. What follows is not a request to retry that history. It is an inventory of two related things: the specific, material irregularities visible within the record placed before the Board in 2025–2026 — most of them visible in the government's own documents — and the documentary discontinuities among the government's records that Plaintiff was later able to catalogue. The former bear directly on whether the record being presumed regular could carry the findings built upon it; the latter are identified as such and are offered to describe the fragmentation of the record, not to establish what was before the Board.

| **Irregularity** | **Evidence** | **Location** |
|---|---|---|
| Overlapping Article 86 / Article 92 allegations and misstated count | May 4, 1992 NJP specifications | ¶¶ 23–24 |
| Article 87 versus medical and duty-status orders | May 18, 1992 medical directive; light-duty and return orders | ¶¶ 25–27 |
| Serious-offense notice versus ADB finding | May 22 notice; ADB report; command forwarding recommendation | ¶ 28 |
| Missing and contradictory record components | Government productions and surviving record; catalogued post-decision in the Comparative Matrix (Ex. 5, not before the Board) | ¶¶ 29–32 |

**1. Overlapping Article 86 / Article 92 allegations and a misstated specification count**

23. Plaintiff does not dispute that the May 2 and May 4, 1992 lateness occurred. The issue is not whether that conduct was disciplinable, but whether the same lateness could rationally be treated as multiple independent acts of misconduct for purposes of constructing the pattern later relied upon to justify separation. Within the May 4, 1992 NJP, the same lateness events were charged twice under different articles: an Article 86 specification alleges that Plaintiff absented himself from his place of duty "from 0630 to 1010 hrs" on May 2, 1992, while an Article 92 specification alleges that, having knowledge of an order to report for duty at 0630, he failed to obey it "by wrongfully arriving late" at approximately 1010 — the same morning, the same event. The pairing repeats exactly for May 4, 1992: absence from 0630 to 0730 under Article 86, and disobedience "by wrongfully arriving late" at approximately 0730 under Article 92. The Article 92 specifications did not identify separate conduct: they do not allege that Plaintiff refused the order, announced an intention not to comply, or committed any separate act of defiance — their pleaded act of disobedience is, literally, arriving late. The seven specifications of that NJP — five under Article 86 and two under Article 92 — thus described five lateness episodes, two of them charged twice.

24. For purposes of the Board's 2026 cumulative-severity analysis, the critical point is factual. The May 4 record describes five lateness episodes. Two of those episodes were also alleged as failures to obey because the pleaded act of disobedience was arriving late. The Decision nevertheless recites six additional specifications of failure to go plus two specifications of disobeying an order, and nowhere states whether it treated the overlapping legal descriptions as separate factual incidents. Plaintiff does not ask this Court to adjudicate multiplicity under court-

martial doctrine. He alleges that, once the Board made the misconduct's "cumulative negative effect" dispositive, reasoned decisionmaking required it to identify accurately what conduct it counted and to address the documented overlap. It did neither.

**2. Article 87 versus contemporaneous medical and duty-status evidence**

25. This defect is independent of the duplication issue and concerns the offense that could otherwise function as the separation's independent severity anchor. The Decision itself recites, two paragraphs apart and without connecting them, that (a) "[o]n 18 May 1992, you were referred to mental health after ingesting over the counter medication," following which Plaintiff was hospitalized, and (b) "[o]n 20 May 1992, you received a third NJP for two days unauthorized absence (UA) and missing ship's movement." Plaintiff was in medical care on base when his ship departed. The Decision draws no finding reconciling the missing-movement offense with the hospitalization its own chronology records. The movement at issue was that of USS Ranger (CV-61), which departed on or about May 18, 1992 — the same day the government's own records place Plaintiff's hospital discharge, light-duty assignment, and directed return to the shore detachment. Plaintiff's DD Form 214, prepared and executed by the government at separation, records the charged period of lost time in block 29 as May 16 through May 18, 1992 — a window that overlaps both the command-imposed restriction then in effect and the documented hospitalization. Every status in that sequence was imposed or documented by the government; none was elected by Plaintiff.

26. The record underlying the Article 87 finding contains its own contradiction. Under the governing Manual, Article 87 required, among other things, that Plaintiff be required in the course

of duty to move with the ship and that he miss that movement through neglect. The May 20, 1992 NJP addressed the alleged May 18 missing movement through neglect. Yet the contemporaneous military medical record placed Plaintiff on light duty and directed him to return to the VF-1 shore detachment rather than to report to or rejoin the departing ship; the medical documentation likewise recommended an administrative medical course, while the command subsequently proceeded on misconduct grounds. The importance of this evidence is not merely mitigation: it bears directly on whether the duty-to-move and neglect predicates of Article 87 were satisfied. This mattered to the 2026 Decision because the Board treated the Article 87 offense as a principal component of the severity premise used to outweigh mitigation and equity, without reconciling contemporaneous government evidence bearing directly on the offense's predicates. The absence of the movement orders themselves compounds the defect: no orders corresponding to the asserted duty to move appear in the government's productions, and none were provided to Plaintiff at separation. Custody and maintenance of service records is the Navy's duty, not the service member's; the absence from the custodian's own file of the orders underpinning the finding the Board treated as most serious is a deficiency of the government's record, not of Plaintiff's proof.

27. The duty-status conflict was structural, not incidental. In the relevant period, the record places Plaintiff under three simultaneously recorded governmental statuses whose requirements the record never reconciles: administrative restriction, as reflected in the record's own "restricted to base" characterization; military medical supervision, including evaluation, a light-duty determination, and a directed return to the shore detachment; and the asserted unrestricted duty to move with the ship on which the Article 87 finding depends. The governing framework for lawful

restraint and duty status required these to be consistent. The record as constituted does not establish which status lawfully controlled Plaintiff's movements at the time of the ship's departure, and the Decision resolves none of this. Nor does the Decision address that the lost-time window recorded on Plaintiff's own DD Form 214 overlapped a documented hospitalization in a government medical facility. An agency may not rest a dispositive severity premise on findings its own contemporaneous records contradict, and then decline to address the contradiction.

**3. The notice and the ADB finding identify different serious offenses**

28. The May 22, 1992 Notice of Administrative Board Proposed Action identified the commission-of-a-serious-offense basis as Article 92, three specifications. The ADB's July 25, 1992 report instead found Article 92, two specifications dated May 2 and May 4, and Article 87, missing movement dated May 18. The command's later forwarding recommendation repeated the latter formulation. The preserved forty-nine-page ADB packet contains no amended notice identifying Article 87 as a serious-offense basis. The record therefore does not disclose when or by what procedure Article 87 replaced one of the three notified Article 92 specifications. This mattered to the 2026 Decision because the Board treated Article 87 as an established component of the misconduct and of its severity without identifying or reconciling the notice-to-finding change. Plaintiff does not ask this Court to decide the legal consequence of that change in the first instance; he alleges that the Board could not presume the regularity of the serious-offense architecture while leaving the discrepancy unanswered.

**4. Missing, incomplete, and internally contradictory record components**

29. Beginning in 2024–2025, Plaintiff obtained the government's own productions of his record, including a National Personnel Records Center production of his personnel file and productions of his medical record, and compared them page-by-page against the contemporaneous personal and ADB copies in his possession.

30. That comparison, organized as a forty-six item comparative matrix (the "Comparative Matrix"), identified, among other things: (a) an arithmetic gap of approximately thirty pages in the sequentially stamped page ranges of the case file forwarded to Navy personnel authorities in 1992; (b) a record that characterizes Plaintiff's pre-board restriction as "restricted to base" while the order restricting him — in fact, to a transient personnel unit under escort, without telephone privileges or writing materials — is absent from the government productions; (c) the absence of the psychological screening evaluation administered during Plaintiff's recruit training, a document bearing directly on the in-service psychiatric characterizations later made of him; (d) the absence of the ADB defense witness list and defense evidentiary materials; (e) multiple documents that exist today only in Plaintiff's personal copies and appear nowhere in any government production of the same record; and (f) the notice-to-finding change in the offenses comprising the serious-offense basis. These are not freestanding historical grievances; each is a discontinuity in the government's own record. They are identified here to show what the surviving record cannot produce and cannot reconcile — the condition of the very record the Decision presumed regular. The Comparative Matrix organizes these discontinuities; it does not establish what the Board possessed.

31. The preserved ADB record itself reflects the one-sided character of the 1992 proceeding: the only substantive witnesses were command personnel outside Plaintiff's daily working chain; a defense witness list was prepared, but it does not appear in the preserved record, and no defense witness testified; the transcript is a summary recording answers without the questions asked; Plaintiff's own participation consisted of answering two questions; and the commanding officer, whose written endorsement to the separation authority contains the most damaging characterizations in the file ("irresponsible, unmotivated, and unwilling to conform to Navy orders and regulations"), did not appear or testify — his endorsement post-dates the board and was never subject to examination.

32. The record also contained contradictions unresolved on its face. The separation was initiated on three notified bases — pattern of misconduct, commission of a serious offense, and personality disorder; the contemporaneous psychiatric evaluation recommended expedited administrative separation on the personality-disorder basis; and the board sustained only the misconduct bases, with no reasoned discussion of why the psychiatric basis was abandoned — while the 2026 advisory opinion grounded its adverse analysis in the same personality-disorder diagnosis the command declined to proceed upon. The record contained an alcohol-abuse diagnosis, a dependency screening prescribing treatment, and command-witness acknowledgments that treatment had been recommended — alongside the commanding officer's statement that Plaintiff's "service is not such to warrant any further treatment." And the record's clerical reliability is itself impaired: the file lists Plaintiff's enlistment as "11 Dec 91," although

active duty began in December 1990, and the board's appointment letter, itself dated July 1992, orders the board to convene on "24 May 1992."

**5. The Board's response to these irregularities**

33. The February 26, 2026 Decision resolved none of them. Four features of the Decision stand against the record just described. First, the Decision "determined the presumption of regularity applies to the finding that you committed the misconduct that formed the basis of your administrative separation," and closes by instructing Plaintiff that "a presumption of regularity attaches to all official records." Second, it states that, as to Plaintiff's contentions of mistreatment, racial discrimination, medical neglect, and denial of due process, Plaintiff "provided no evidence, other than your statement, to substantiate your contentions." Third, it recites that the Board considered Plaintiff's "application together with all material submitted in support thereof." Fourth, the documentary record actually placed before the Board contained each of the showings described above — among them the 1992 character witness statements, the composition of the ADB record itself, and the August 28, 1992 contemporaneous statement — and the Decision identifies none of those documents, contains no exhibit list, and makes no finding about any of them: not the overlapping and misstated specification count appearing on the face of the charging documents; and not the notice-to-finding change in the serious offenses between the May 22 notice and the ADB finding. Nor were the documentary submissions unmoored from the contentions the Decision declared unsubstantiated: the contemporaneous medical records, the alcohol-dependency screening prescribing treatment, and the command's contrary statement that Plaintiff's service did not "warrant any further treatment" were directed to the medical-neglect contention; and the

preserved composition of the ADB record itself — the absent defense witness list, the unexamined post-board endorsement — was directed to the due-process contention. The sworn account identifying the officer, the racial statement, the threatened outcome, and the resulting chronology, together with the contemporaneous performance record documenting the abrupt reversal from a 3.6 evaluation recommending retention to the subsequent adverse evaluation and command actions during the identified period, was directed to the racial-discrimination and disparate-treatment contention. This sequence appears on the face of the government's own command paperwork and requires no inference about anyone's state of mind. The earliest entry — a counseling and warning entry dated November 29, 1991 (Exhibit 9) — retained Plaintiff in service, identified a single performance deficiency (a failure to meet time requirements, amounting to no charged offense), and nonetheless advised that subsequent conduct "could result in an administrative separation under Other Than Honorable conditions." The governing manual treats such an entry as a corrective measure: MILPERSMAN 3630600 conditions misconduct-based separation processing on the member first being counseled by the parent command about identified deficiencies and afforded a reasonable opportunity to correct them, documented by a Page 13 administrative-remarks entry. Yet the earliest such entry in Plaintiff's record introduced Other-Than-Honorable separation language at the outset — before the first nonjudicial punishment of January 8, 1992 — and was authored not by a member of Plaintiff's chain of command but by the command's Legal Officer, whose title appears on the face of the entry. Approximately two months later, the command's own January 31, 1992 performance evaluation (Exhibit 8) recorded that Plaintiff "performs well with minimum supervision," was "making satisfactory progress," possessed

"unlimited potential to succeed," and expressly recommended retention. Only afterward did the assessment reverse and separation processing accelerate. The Board stated there was no evidence of mistreatment beyond Plaintiff's statement. Yet the oldest preserved counseling document before it shows that the first recorded warning Plaintiff received — for tardiness — was administered by the squadron Legal Officer and immediately framed in terms of potential Other-Than-Honorable separation, with no preserved antecedent corrective history explaining that escalation; in effect, the earliest warning in the record already carried the terminal consequence. That chronology is documentary, and the Decision does not address it. Nor does the Decision engage Plaintiff's contemporaneous voluntary statement (Exhibit 7): the Board dismissed the mistreatment and disparate-treatment contention as unsupported by anything beyond Plaintiff's statement without addressing that statement or the contemporaneous command records — the counseling entry, the retention evaluation, and the voluntary statement — that Plaintiff identified as corroborating it. The receipts and transmittal ledger independently establish that the Board's designated mailbox received the identified submissions. Yet the Decision neither determines that any identified exhibit was not part of the record nor explains how the documentary submissions could have been considered while the pertinent contentions remained supported only by Plaintiff's statement. At no point does the Decision identify the "substantial evidence to the contrary" threshold of 32 C.F.R. § 723.3(e)(2), or explain why the showings before it did not meet that threshold.

**B. The application, Plaintiff's documented submissions, and the pro se posture**

34. The Board received Plaintiff's Application for Correction of Military Record (DD Form 149) on July 17, 2025, as the Board's own correspondence confirms.

35. On July 17, 2025, Plaintiff transmitted his application and supporting evidence to the Board's designated intake mailbox (BCNRApplication@us.navy.mil) in a series of separately identified emails. For multiple material transmissions, the documentation establishes the full chain: the email was sent; its attachments were specifically identified in the transmission itself; the transmission was successfully relayed to the Board's mailbox, generating a postmaster relay receipt; and the Board's mailbox generated a read receipt. Among these submissions, Plaintiff expressly transmitted his post-service rehabilitation, education, credentialing, and publication materials for equitable consideration; that transmission is documented in Plaintiff's sent records, with its attachments identified in the transmittal itself. A supplemental evidentiary submission followed on August 8, 2025, for which the transmittal records document both delivery and read confirmations. Plaintiff maintains a transmittal ledger cataloguing every transmission — date, subject, attachments identified, and the corresponding receipts; the ledger (Exhibit 4) and the underlying receipts are documentary exhibits available to the Court and to Defendants.

36. The Comparative Matrix (Exhibit 5) was prepared after the Board's February 26, 2026 decision to systematically inventory discrepancies among the surviving historical records, Plaintiff's preserved copies, and subsequent government productions. It is not offered as evidence that the Board possessed the Matrix itself. Its purpose is to identify and organize documentary discontinuities — including records referenced by surviving government documents but absent from government productions, government-originated records surviving only in Plaintiff's personal archive, and inconsistencies among the surviving official records themselves. The concern the Matrix organizes did not originate in this litigation: Plaintiff recorded the loss of

paperwork contemporaneously in 1992, during separation processing, in his August 28, 1992 statement (Exhibit 7) noting "the all too habitual loss of paperwork necessary for expeditious processing." The Matrix does not establish what the Board possessed; it demonstrates what the surviving record cannot produce.

37. These challenges were presented in the plain terms of a pro se applicant. Plaintiff's sworn personal statement before the Board, among other submissions, identified the May 4, 1992 NJP as charging five Article 86 and two Article 92 specifications arising from the same instances of tardiness; stated that the Article 87 charge was brought while he was hospitalized following a suicide attempt; described his light-duty status and medical restrictions; connected the tardiness to what he later understood to be symptoms of undiagnosed ADHD, including time blindness; and identified the DD-214's omission of his Montgomery GI Bill election. The Board requested no clarification of any of these points and identified no curable deficiency in their presentation; the Decision instead treated material points as unsupported, absent, or insufficient. The Board's duty to review the pertinent evidence does not depend on an applicant's citation of the Manual for Courts-Martial by paragraph: the Board's proceedings are non-adversarial and paper-based, and applications are read for their substance. Cf. Sims v. Apfel, 530 U.S. 103 (2000) (analogous authority: issue-exhaustion requirements are inappropriate in non-adversarial, inquisitorial proceedings where claimants are typically unrepresented). In the federal courts, the filings of an unrepresented litigant are liberally construed — an orientation that attaches to the litigant's status, not to the polish of his papers. Haines v. Kerner, 404 U.S. 519, 520–21 (1972); Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). These authorities are offered as supportive analogies for how

substance is read from unrepresented submissions, not as commands specific to Board proceedings; the operative duties remain those imposed by the APA and the Board's own regulations.

**C. The advisory opinion**

38. The Board obtained an advisory opinion ("AO") (Exhibit 3) from a licensed clinical psychologist, signed January 1, 2026, and transmitted to Plaintiff by the Board's email of January 6, 2026, which carried the advisory opinion as its sole attachment. The AO addressed only the mental-health aspects of the application. Its own enumeration of Plaintiff's submissions confirms what was before it, including "[p]artial active duty administrative and medical records" and a letter from a licensed clinical social worker (August 2023) noting diagnoses of and treatment for ADHD, Adjustment Disorder, and PTSD.

39. The AO concluded there was "insufficient evidence of a primary mental health condition or TBI that existed in service," while stating that "[a]dditional records (e.g., active-duty medical records, post-service mental health records describing the Petitioner's diagnosis, symptoms, and their specific link to his separation) may aid in rendering an alternate opinion." The AO thus conceded on its face that the record before it was partial and that a completed record could alter its conclusion.

40. Three features of the AO were squarely challenged in Plaintiff's rebuttal. First, the AO's quotation of the single May 18, 1992 clinical note on which the in-service psychiatric characterization rests contains an unexplained ellipsis — "He drank 6+ beers…then ingested 20 Motrin" — omitting, without disclosure, material recorded in the note between the quoted clauses;

and although the quoted passage itself refers to "several situational stressors," the note's own enumeration of those stressors appears nowhere in the AO's account. Second, the AO reasoned that a personality disorder "is pre-existing to military service by definition," while the psychological screening evaluation from Plaintiff's recruit training — the record document most probative of his pre-service condition — is absent from the record. Third, the AO characterized the post-service ADHD diagnosis as "temporally remote to service" without addressing the contention Plaintiff had expressly presented: that the diagnosis was relevant to the in-service symptoms he reported — recurrent tardiness and time-management dysfunction, the very conduct underlying the absence-related offenses.

41. By email dated January 6, 2026, the Board invited Plaintiff to respond to the AO within thirty days. Plaintiff transmitted a documentary rebuttal (included within Exhibit 3) presenting these points on January 9, 2026, and on January 28, 2026 retransmitted the rebuttal in flattened PDF format to eliminate any question of technical accessibility. Both transmissions are documented in Plaintiff's transmittal records, which record a delivery confirmation to the Board's mailbox for each. The Decision's entire treatment of that rebuttal is one sentence: "After reviewing your rebuttal evidence, the AO remained unchanged." Neither the AO's author nor the Board identified a single rebuttal point, explained why any was rejected, or reconciled the rebuttal's documentary showings with the AO's conclusions.

**D. The February 26, 2026 Decision**

42. A three-member panel considered the application in executive session on February 10, 2026, without Plaintiff's appearance; the Board "determined that a personal appearance was not

necessary." The Decision, signed February 26, 2026, denied all relief. The Board waived the limitations period and decided the application on its merits.

43. Before its substantive reasoning is examined, the care of the Decision's own recitation warrants note. It misstates the date of the ADB by a decade ("On 25 July 1982, the ADB determined…"), asserts a "two days unauthorized absence" underlying the May 20, 1992 NJP without identifying the specification, dates, or appointed place of duty, recites the May 4, 1992 NJP as comprising six specifications of failure to go to an appointed place of duty although the underlying NJP record charges five, and does not reconcile the "two days" assertion against the three-day time-lost entry on Plaintiff's DD-214 or the ADB's enumerated findings. Plaintiff pleads these not as independent grounds but as facts bearing on the care with which the record was reviewed in a case about the care with which the record was kept.

44. On causation, page four of the Decision states that "the Board simply had insufficient information available upon which to make such a conclusion and recognized the same concerns raised in the AO." In the same paragraph, the Decision states: "Moreover, even if the Board assumed that your misconduct was somehow attributable to TBI or any mental health conditions, the Board unequivocally concluded that the severity and cumulative negative effect of your serious misconduct more than outweighed the potential mitigation offered by either condition." In so concluding, the Decision treated the AO's answer to the PTSD/TBI question as an answer to the different question the application presented: whether the contemporaneously documented conditions — an adjustment disorder, an alcohol-abuse diagnosis, and a suicide-related event, each

recorded at the very time of the conduct — mitigated that conduct. The two questions are not the same, and only the first was analyzed.

45. On equity, the Decision recites that the Board considered, "amongst other factors, your contentions, the totality of your service, your need for veterans' benefits, the non-violent nature of your misconduct, your relative youth and immaturity at the time of your misconduct, the negative effect your discharge has had on your life, your rehabilitation efforts, your mental health issues, your claim of racial discrimination and disparate treatment, your claim of the harshness of your punishment, and the passage of time since your discharge." Its analysis of that list consists of the conclusions that the mitigating factors "were not nearly sufficient to justify any equitable relief" and that "the severity of your misconduct far outweighed all of the mitigating factors combined." No mitigating factor is individually discussed, and no post-service fact is mentioned; the entire equitable inquiry is resolved through the same severity premise.

46. On the disability claim, the Decision reasons that Plaintiff "[was] never referred to a medical board by any of [his] medical providers and [his] command did not provide a non-medical assessment that [he was] unable to perform [his] military duties" — treating the absence of formal referrals as dispositive against Plaintiff — and adds that "even if there was medical evidence of a qualifying disability condition along with evidence of unfitness," Plaintiff would remain "ineligible for disability processing due to your misconduct based administrative separation." The referral-based reasoning was itself contradicted by the record before the Board. The contemporaneous military medical record contains the medical officer's written recommendation to "process for admin separation due to severe personality disorder with potential for self harm

due to impulsive behavior," with the notation that "[e]xpeditious separation is recommended" and with the medical officer designating himself the point of contact for the disposition — the medical department retaining a continuing role in the separation rather than returning the matter to the command without further medical involvement. Whatever the correct administrative channel for that recommendation, it is a military medical officer's written judgment recommending expeditious administrative separation on the basis of that diagnosed condition and its noted potential for self-harm due to impulsive behavior. A finding of "no evidence" of unfitness for continued naval service — reasoned from the absence of referrals that only the government's own providers and command could initiate — does not engage that document, and the Decision nowhere mentions it.

47. On the DD-214 education-benefits entry, Plaintiff's application sought correction of an entry on a Navy-issued form — the unchecked education-benefits block on his DD-214 — to conform it to enlistment-era documents showing Montgomery GI Bill enrollment and contribution. The Decision reframed this as a request for benefits: "The Board has no statutory authority to grant, restore, or even determine your eligibility for the GI Bill. Therefore, the Board took no action on this aspect of your application." Correction of Navy-issued records is the function committed to the Board by 10 U.S.C. § 1552; the answer given responds to a question Plaintiff did not ask, and the question Plaintiff did ask received no action at all.

48. The Decision closes by advising Plaintiff that reconsideration is available upon "new matters" — while its own alternative holdings pre-announce that the principal categories of new

matter (evidence of mental-health causation; medical evidence of disability) would not change the outcome.

**E. The post-service record before the Board**

49. In the nearly thirty-four years since September 21, 1992, Plaintiff has never been arrested for, charged with, or convicted of any criminal offense. He has earned academic degrees and professional certifications and is the author of published works. These materials were expressly transmitted to the Board on July 17, 2025 for equitable consideration; the transmission is documented in Plaintiff's sent records, with its attachments identified in the transmittal itself. The Decision does not mention any of them.

**F. Prior proceedings**

50. Plaintiff discloses the following prior proceedings. Harper v. Department of the Navy, No. 1:25-cv-03345 (D.D.C.), filed in September 2025, was dismissed without prejudice on November 13, 2025 under Federal Rule of Civil Procedure 8; that complaint predated the Decision challenged here and could not have challenged it. In re Harper, No. 25-5424 (D.C. Cir.), a mandamus petition arising from the district proceeding, was resolved by per curiam order of February 19, 2026 granting leave to proceed in forma pauperis and dismissing in part and denying in part the petition. The Decision under review issued after both dispositions. The prior proceedings are disclosed on the civil cover sheet and in any related-case notice required by the local rules of this district. This complaint is deliberately confined to review of the February 26, 2026 Decision on the administrative record; Plaintiff reserves, and does not plead here, claims arising from other facts. Plaintiff likewise reserves all arguments not expressly pleaded herein,

including but not limited to arguments that may arise from the certified administrative record after it is produced.

51. Taken together, the record before the Board presented multiple independent forms of irregularity: overlapping legal descriptions of identical lateness events and a misstated specification count; an Article 87 finding materially contradicted by contemporaneous duty-status evidence; a notice identifying three Article 92 specifications followed by a finding identifying two Article 92 specifications and Article 87; and missing or incomplete record components. The February 26, 2026 Decision resolved none of those conflicts before invoking the presumption of regularity and treating the resulting misconduct history as dispositive. The APA question presented here is therefore not whether this Court should retry the 1992 proceedings, but whether the Board could rationally rely on regularity in 2026 without first resolving substantial contrary evidence already before it.

**COUNT I**

**(APA § 706(2)(A) — Failure To Respond to Nonfrivolous, Potentially Dispositive Record-Based Arguments, and Mischaracterization of the Evidence Submitted)**

52. Plaintiff incorporates the foregoing paragraphs.

53. The central issue is not whether every defect in the 1992 record independently invalidated Plaintiff's discharge. It is whether the Board could invoke the presumption of regularity in 2026 without resolving material evidence showing that the record was irregular in multiple identified respects.

54. The Board's own regulation makes the presumption conditional. 32 C.F.R. § 723.3(e)(2). By invoking the presumption without first determining whether "substantial evidence

to the contrary" existed, the Board inverted the regulatory sequence: it treated the presumption as a substitute for the inquiry rather than a rule for the absence of evidence.

55. The record-integrity showings actually presented to the Board — the overlapping May 1992 allegations and misstated specification count, and the notice-to-finding change from three Article 92 specifications to two Article 92 specifications plus Article 87 — were not frivolous on their face and could affect the Board's ultimate disposition, because each bears directly on whether the record evidences probable material error or injustice, the very question 10 U.S.C. § 1552 and 32 C.F.R. Part 723 commit to the Board. The Decision gives no answer to either. Plaintiff's later comparative audit additionally identified discontinuities in the surviving records — among them the approximately thirty-page stamped-range gap in the 1992 forwarding file, the missing restriction order underlying the "restricted to base" characterization, the absent recruit-training screening evaluation, the absent defense witness list and defense materials, and documents surviving only in Plaintiff's copies — which Plaintiff offers solely on the question of record completeness and not as evidence of what the Board possessed. Under Frizelle, the Decision's failure to address the nonfrivolous showings before it warrants vacatur and remand for reconsideration under the proper decisional framework.

56. The Decision compounds that failure by mischaracterizing the evidence before it. It states that Plaintiff "provided no evidence, other than your statement," as to his contentions of mistreatment, discrimination, medical neglect, and denial of due process — a characterization that runs counter to the documented submissions directed to those very contentions, and that cannot be reconciled with the same Decision's recital that the Board considered "all material submitted in

support" of the application. An agency whose stated account of the evidence is contradicted by its own record has not engaged in reasoned decisionmaking.

57. The Board likewise disposed of the DD-214 education-benefits correction request by answering a question Plaintiff did not ask — benefits eligibility — while taking "no action" on the question he did ask: correction of an entry on a Navy-issued form, a matter squarely within the Board's § 1552 function.

58. The failure was not merely one of incomplete explanation. Congress vested the Secretary, acting through civilian correction boards, with authority to correct military records when necessary to remedy error or injustice. 10 U.S.C. § 1552. Plaintiff placed before the Board evidence directed to whether the historical record itself accurately and lawfully supported the findings carried forward from 1992. By invoking regularity without resolving that evidence, the Board treated the inherited record as the answer to the statutory question whether that record required correction, rather than exercising the corrective judgment Congress assigned to it. The Decision thus depended upon a presumption that was not lawfully available on this record once substantial contrary evidence had materially placed regularity in dispute.

59. These failures render the Decision arbitrary and capricious, and they contravene the Board's own regulations requiring review of the pertinent evidence and a statement of the grounds and essential facts for a denial. 5 U.S.C. § 706(2)(A); 32 C.F.R. § 723.3(e)(1), (e)(3)–(4); State Farm, 463 U.S. at 43; Frizelle, 111 F.3d at 177; Butte County, 613 F.3d at 194. Whether the record before the Board retained its integrity was a central question the application required the Board to adjudicate; the Board did not ask, let alone answer, it. See Baxley, slip op. at 11. Plaintiff does not

ask the Court to decide the underlying questions; he asks the Court to hold that the Board was required to answer them.

## COUNT II

### (APA § 706(2)(A) — Failure To Articulate a Rational Connection Between the Record and the Dispositive Severity Premise)

60. Plaintiff incorporates the foregoing paragraphs.

61. The Decision makes "the severity and cumulative negative effect of your serious misconduct" dispositive in both its mental-health-mitigation and equitable analyses: it is the stated reason even assumed mental-health causation would not matter, and the stated reason every mitigating factor fails "combined." The disability alternative then relies upon the same antecedent conclusion that Plaintiff was appropriately discharged for misconduct. A premise carrying that much weight required a reasoned foundation tied to supported facts.

62. The Decision supplies descriptors, but not the essential factual bridge. It says Plaintiff showed a "complete disregard for military authority and regulations," was given opportunities to correct his conduct but "chose" to continue, and negatively affected good order and discipline. Yet it identifies no charged act, specification, or ADB finding characterized as a complete disregard of military authority; no operational disruption, impaired mission, affected person, or other concrete consequence establishing harm to good order and discipline; and no factual basis for the finding of volitional choice. The closest historical source it quotes is the commanding officer's post-board endorsement that Plaintiff was "unwilling to conform to Navy orders and regulations," itself a generalized conclusion rather than an identified act or consequence. The Board intensified that conclusion into "complete disregard" without explaining the escalation, and without reconciling it

with the medical restrictions, hospitalization, and mental-health evidence bearing on whether the disputed conduct was volitional. Plaintiff does not ask the Court to reweigh the misconduct or find it minor. He alleges that the Board substituted amplified characterizations for the essential facts and rational connection its dispositive severity premise required. State Farm, 463 U.S. at 43; Dickson, 68 F.3d at 1404–05; Kreis, 866 F.2d at 1514–15.

63. Nor can the missing bridge be supplied merely by the 1992 processing label "commission of a serious offense." The governing MILPERSMAN used that phrase as an administrative category requiring that a punitive discharge be authorized for the same or a closely related offense and that the specific circumstances warrant separation. The category's legal availability did not, by itself, answer the separate equitable question the Board confronted in 2026: why the supported facts were so severe that assumed mental-health causation, youth, nonviolence, rehabilitation, the passage of more than thirty-three years, and every other mitigating factor could not alter the result. That distinction is especially consequential because the notice and ADB finding identify different offenses within the category, and because the record materially challenges Article 87, the offense that otherwise supplies the principal independent severity anchor. The contemporaneous record documents medical supervision, light-duty status, and a return direction inconsistent with an unrestricted duty to depart aboard the ship. The Board could not rationally treat Article 87 as an unquestioned severity predicate without addressing those facts or the unresolved conflict among Plaintiff's simultaneously recorded statuses: administrative restriction, medical supervision, and the asserted unrestricted duty to move with the ship.

64. The defect compounds at the level of accumulation. The record describes five May 1992 lateness episodes, two also alleged under Article 92 because the act of disobedience was the same arrival late; the Decision misstates the Article 86 count as six; the notified serious-offense basis differs from the ADB finding; and the Article 87 finding is materially challenged by contemporaneous duty-status evidence. Reasoned decisionmaking therefore required the Board to identify the independently supported conduct it actually counted, resolve the record challenges directed at that conduct, and explain why the supported remainder was sufficiently severe to outweigh every mitigating and equitable consideration combined. The Decision contains no such analysis. Plaintiff does not ask this Court to conduct a de novo military-law adjudication of the 1992 offenses; he asks whether the Board could rationally rely upon the misconduct architecture and its cumulative severity while failing to establish what that architecture validly contained.

**COUNT III**

**(APA § 706(2)(A) — Adoption of the Advisory Opinion Without a Reasoned Response to the Rebuttal)**

65. Plaintiff incorporates the foregoing paragraphs.

66. Frizelle does not require encyclopedic discussion of every submission; it requires a response where an argument, not frivolous on its face, could affect the outcome. Plaintiff's January 2026 rebuttal presented at least four such arguments: (a) the AO conceded it worked from partial records and that additional records could produce an alternate opinion; (b) the AO's quotation of the sole May 18, 1992 clinical note contains an undisclosed ellipsis, and the note's own enumeration of the situational stressors its quoted passage references appears nowhere in the AO; (c) the AO's conclusion that a personality disorder is "pre-existing to military service by

definition" was reached in the absence of the recruit-training screening evaluation — the record document that would test the premise; and (d) the AO dismissed the post-service ADHD diagnosis as "temporally remote to service" without addressing Plaintiff's expressly presented contention that the diagnosis bears on the in-service symptoms he reported — the recurrent tardiness and time-management dysfunction underlying the absence-related offenses at the center of the separation.

67. Each argument was potentially material: each goes to whether the psychiatric characterization sustaining the discharge, and the AO endorsing it, rest on a complete and fairly read record. The Board compounded the failure by adopting the AO's PTSD/TBI-specific conclusion as though it resolved the broader mental-health-mitigation question the application actually presented. The Board's complete response was one sentence: "After reviewing your rebuttal evidence, the AO remained unchanged." Neither the Board nor the AO answered any of the four propositions. Adopting an advisory opinion over a substantive documentary rebuttal, without resolving any of the rebuttal's nonfrivolous points, is arbitrary and capricious. Frizelle, 111 F.3d at 177; Kreis, 866 F.2d at 1514–15; Butte County, 613 F.3d at 194.

**COUNT IV**

**(APA § 706(2)(A) — Inadequate Reasoned Consideration of Material Equitable Evidence Under the Board's Own Governing Guidance)**

68. Plaintiff incorporates the foregoing paragraphs.

69. Plaintiff expressly presented equity, injustice, and clemency as an independent ground for relief and transmitted a documented post-service record for that determination. The Decision states that the Board applied the Secretary's governing equity guidance, including the July 25,

2018 memorandum of the Under Secretary of Defense regarding equity, injustice, and clemency determinations, and it lists "your rehabilitation efforts" and "the passage of time since your discharge" among the factors considered. The defect is not a failure to list the factors — the Decision lists them. The defect is that the Decision gives no individual discussion of any factor, never mentions the post-service evidence expressly transmitted for equitable consideration — a post-service record spanning more than thirty-three years without arrest, charge, or conviction, with documented education, credentials, and published work — and resolves the entire equitable inquiry through the same unexplained severity premise challenged in Count II. Recitation of the clemency framework is not a reasoned disposition of the clemency ground presented.

70. Where an agency announces that it applied guidance requiring consideration of specified matters, reasoned decisionmaking requires the decision to reflect actual consideration of the material evidence bearing on those matters. Silence as to the most probative equitable evidence in the record, coupled with a conclusory declaration that everything is outweighed, is inadequate under the standards courts apply to correction boards, and contravenes the Board's own regulations requiring review of the pertinent evidence and a reasoned statement of grounds. 32 C.F.R. § 723.3(e)(1), (e)(3)–(4); Dickson, 68 F.3d at 1404–05; Kreis, 866 F.2d at 1514–15; State Farm, 463 U.S. at 43.

**COUNT V**

**(APA § 706(2)(A) — Internally Inconsistent and Unsupported Alternative Findings)**

71. Plaintiff incorporates the foregoing paragraphs.

72. The Decision states the Board "had insufficient information" to determine whether Plaintiff's conduct was attributable to a mental-health condition — and in the same paragraph "unequivocally conclude[s]" that even if it were, the outcome would not change. It finds no medical basis to evaluate disability — and holds that even with medical evidence of a qualifying disability and unfitness, Plaintiff would be "ineligible" because of the very separation whose validity was the question presented. It then invites reconsideration on "new matters" whose principal categories its alternative findings have already declared immaterial.

73. An agency may not simultaneously ground its denial in the insufficiency of the evidence and in the immateriality of the evidence it lacks. Either the missing evidence could matter — in which case the alternative findings were reached without the information necessary to reach them — or it could not, in which case the insufficiency rationale and the invitation to supply new matter are illusory. Internally inconsistent reasoning of this kind is arbitrary and capricious, and the alternative findings are unsupported by the record the Board itself described as insufficient. The inconsistency is not merely carried forward; it is magnified. Unresolved historical ambiguities become a larger misconduct tally, a generalized character judgment becomes "complete disregard," unexamined medical and duty-status evidence becomes a voluntary "choice," and the resulting severity premise becomes categorical grounds for treating missing mental-health evidence, disability evidence, and documented clemency evidence as unable to change the result. When every unresolved variance is assigned against Plaintiff, uncertainty ceases to operate neutrally and becomes cumulative prejudice: Plaintiff bears the entire cost of gaps in a record whose integrity he challenged, while the agency preserves the benefit of the conclusions derived

from those same gaps. The presumption of regularity cannot lawfully operate as that one-way allocation of uncertainty once substantial contrary evidence is before the Board. Those alternative findings assume the integrity of the very predicate the application challenged and the Decision never resolved. 5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 43.

**THE NECESSITY OF VACATUR**

74. Vacatur is the necessary predicate to any effective remand. Remand without vacatur would not cure the defects identified above, because the Decision has already declared — categorically and in advance — that favorable evidence on mental-health causation and on qualifying disability and unfitness would not alter the result. Those alternative findings are themselves challenged here as arbitrary (Count V). If they were left standing, they would constrain reconsideration to the appearance of process: the Board would revisit a record whose principal open questions its extant decision has pre-answered. The alternative findings must accordingly be set aside, not merely revisited.

75. The requested relief does not instruct the Board what factual conclusion to reach. It requires the Board to reach its conclusion through the proper evidentiary sequence: identify the challenged material finding; examine the substantial contrary evidence presented; determine from the administrative record whether the finding remains supportable; explain that determination; and, where material error or injustice is established, exercise the correction authority provided by 10 U.S.C. § 1552. The presumption of regularity may establish the starting position. It may not replace that inquiry once regularity itself has been materially put in dispute. That sequence is necessary

not to dictate the Board's substantive result, but to ensure that the statutory correction function is actually exercised rather than displaced by the presumption attached to the record under review.

76. The remand requested is for reconsideration under the correct decisional framework, not reconsideration under the existing Decision. The instructions sought below do not prescribe step-by-step adjudication; they require the Board to decide the questions committed to it, on a complete record, without substituting presumption for resolution. If the Board determines that the record establishes a material error or injustice, it must then exercise the correction authority Congress entrusted to it rather than preserve the challenged result through an unsupported factual predicate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Declare that the Board's February 26, 2026 Decision, Docket No. 8252-25, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

(b) Vacate and set aside the Decision in its entirety, including specifically its alternative findings that assumed favorable evidence of mental-health causation, and of qualifying disability and unfitness, would not alter the outcome;

(c) Remand to the Secretary of the Navy for proceedings through the BCNR consistent with the Court's judgment and under the correct decisional framework, with instructions that on remand the Board, as to each challenged material finding: (i) identify the finding; (ii) examine the substantial contrary evidence presented; (iii) determine from the complete administrative record

whether the finding remains supportable, without permitting the presumption of regularity to replace that inquiry once regularity has been materially put in dispute, consistent with 32 C.F.R. § 723.3(e)(2); (iv) explain that determination; and (v) where material error or injustice is established under the governing standard, exercise the correction authority provided by 10 U.S.C. § 1552;

(d) Order Defendants to compile, certify, and file the complete administrative record;

(e) Award Plaintiff his costs, and reasonable attorney's fees under 28 U.S.C. § 2412 should counsel appear on his behalf; and

(f) Grant such other and further relief as the Court deems just and proper.

Because this is an action for review on an administrative record, no jury trial is available or demanded.

Dated: ______________, 2026

Respectfully submitted,

______________________________

**Osei A. Harper**
Plaintiff, pro se

613 E. 9th Avenue

Havana, Florida 32333

oseis572@gmail.com